1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

9  STEVEN LAWRENCE SCHMIDT,                    CV F   03-6124 AWI DLB HC

10                     Petitioner,            FINDINGS AND RECOMMENDATIONS
                                              REGARDING AMENDED PETITION FOR
11          v.                                WRIT OF HABEAS CORPUS

12                                            [Doc. 7]
    A.K. SCRIBNER,
13
                          Respondent.
14  _____/

15
16          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
17  pursuant to 28 U.S.C. § 2254.

                          BACKGROUND[1]
18
19          On November 3, 1999, following a jury trial in the Stanislaus County Superior Court,
20  Petitioner was found guilty of attempted burglary (Cal. Pen. Code[2] §§ 664/459); and possession
    of a firearm by a felon (§ 12021.)  Petitioner was sentenced to a total term of fifty-five years to
21  life.  The sentence was based on a twenty-nine-year-to-life sentence for count 2, to which the
22  court added a one-year arming enhancement (§ 12022(a)(1)) and five 5-year terms for prior
23  felony convictions (§ 667(a)).  A concurrent twenty-eight-year-to-life sentence was imposed on
24  count 3.  (CT 259-260; Respondent's Exhibit 1.)
25

26  _____

27      [1] This information is derived from the amended petition for writ of habeas corpus, Respondent's answer,
    and Petitioner's traverse.

28      [2] All further statutory references are to the California Penal Code unless otherwise indicated.

                                    1

1    Petitioner filed a notice of appeal to the California Court of Appeal, Fifth Appellate

2  District on June 8, 2000.  (Respondent's Exhibit 2.)

3    On December 11, 2000, Petitioner filed a petition for writ of habeas corpus in the Fifth

4  District Court of Appeal.  (Respondent's Exhibit 3.)

5    On August 24, 2001, while the direct appeal was pending, Petitioner filed a petition for

6  writ of habeas corpus with the California Supreme Court.  (Respondent's Exhibit 4.)

7    On September 27, 2001, the Fifth District Court of Appeal affirmed the judgment in its

8  entirety.  (Respondent's Exhibit 5.)

9    On October 31, 2001, Petitioner filed his petition for review with the California Supreme

10  Court.  (Respondent's Exhibit 6.)

11    On December 12, 2001, the California Supreme Court denied the petition for review.

12  (Respondent's Exhibit 7.)  On December 19, 2001, the California Supreme Court denied the

13  petition.  (Respondent's Exhibit 8.)

14    On February 15, 2002, Petitioner filed a petition for writ of habeas corpus with the

15  Stanislaus County Superior Court.  The petition was denied on February 20, 2002.

16  (Respondent's Exhibit 9.)

17    On April 16, 2002, Petitioner filed a petition for writ of habeas corpus with the Fifth

18  District Court of Appeal.  The petition was denied on April 25, 2002.  (Respondent's Exhibit 10.)

19    On May 7, 2002, Petitioner filed another petition for writ of habeas corpus with the Fifth

20  District Court of Appeal.  That petition was denied on May 16, 2002.  (Respondent's Exhibit 11.)

21    On July 15, 2002, Petitioner filed a petition for writ of habeas corpus with the California

22  Supreme Court.  The petition was denied on November 20, 2002.  (Respondent's Exhibit 12.)

23    Petitioner filed the instant petition for writ of habeas corpus on August 15, 2003.

24  Pursuant to the Court's order of November 3, 2003, Petitioner filed an amended petition on

25  November 19, 2003.

26    On April 14, 2004, Respondent filed a motion to dismiss the amended petition on the

27  ground that it contained exhausted and unexhausted claims.  On July 16, 2004, Petitioner filed a

28  response to the motion conceding that Claim 3 of the amended petition was unexhausted.  Based

2

1   on Petitioner's concession the Court construed his request as a motion to withdraw the

2   unexhausted claim and granted said request.  (Court Doc. 16.)

3        Respondent filed an answer to the amended petition on October 12, 2004, and Petitioner

4   filed a traverse on November 19, 2004

5                            STATEMENT OF FACTS[3]

6        In February of 1998 [footnote omitted], Paul Mitts was living with his
    girlfriend Carla Ryken at a duplex unit in Ceres.  During the time Mitts and Ryken
    lived together, Ryken mentioned some acquaintances, [Petitioner] and Michael
7   Duckett, whom Ryken called "Klondike."  Mitts did not know either man.  While
    Ryken was living with Mitts, Ryken learned she was pregnant.  Mitts testified that
8   Ryken sometimes played with his two dogs and called them by name.
9        On February 14, Mitts took Ryken out to dinner for Valentine's Day.
    When they returned home, Mitts gave Ryken some money because she told him
10  she wanted to go shopping at Wal-Mart.  Ryken left but did not return to Mitt's
    house for three days.  Mitts did not know where she was.  When Ryken returned
11  on February 17, she was under the influence of drugs.  Mitts told her to leave.
    Ryken became enraged and started screaming and swinging her arms at Mitts.
12  She struck him.  Mitts told Ryken, "'You're out of here.'"  He pushed her out of
    the house and threw her belongings on the porch.
13       Mitts normally worked evenings or nights.  On the evening of February 26,
    Mitts took off work to go out with Yvetta Watson.  Mitts confirmed his date with
14  Watson on the phone a little after 8:00 p.m.  Just prior to leaving the house
    between 8:30 and 9:00 p.m., Ryken called and was very apologetic.  Mitts told her
15  he could not talk because he was going out.  When Mitts went to Watson's
    residence to pick her up, he was told she was ill, although Mitts did not see
16  Watson.  Mitts returned home and watched television in his bedroom.
17       Dale Wilson lived next door to Mitt's duplex.  On February 26, Wilson
    noticed a man sitting in a car across the street from the duplex.  The man, whom
18  Wilson identified as [Petitioner], sat in the car for 45 minutes to an hour watching
    the duplex.  Wilson approached [Petitioner] and asked him what he was doing.
19  [Petitioner] did not respond and drove away.  Later that night, after 10:00 p.m.,
    Wilson saw [Petitioner] and Duckett, whom Wilson had met before, walking on
    the sidewalk in front of Mitts's duplex.
20       Mitts had installed security cameras to survey the area outside his duplex
    shortly after moving in, because of a high incidence of theft from neighbors' yards
21  and cars parked in the vicinity.  Mitts also wanted to be able to see anyone coming
    to his front door during the day because he worked nights and did not want to be
22  disturbed.  Mitts was able to view the surveillance cameras from a monitor
    installed in his bedroom.  One camera was aimed at the front of his property and
23  the other was located above the sliding glass door in the side yard.
24       Shortly after 10:00 p.m. on February 26, while Mitts was watching
    television, he saw, via the video monitor, two men approach the front door.  Mitts
25  did not recognize the men.  The two men knocked on the door and rang the
    doorbell.  Mitts did not answer the door because he did not know who they were.

26  _____

27     [3] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth
    Appellate District appearing as Exhibit 5, of the Answer to the Amended Petition for Writ of Habeas Corpus.  The
28  Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

The men left the front door and walked toward the garage. Mitts heard someone shaking and trying to open the garage door. Mitts had loaned his car to a cousin who lived with him so he would have a ride home from work that evening. As a result, there was no car parked either in front of the duplex or in the garage.

Approximately 20 seconds later, the men came back toward the front door and jumped over the gate between the front door and the sliding glass door. As they jumped over the fence, Mitts got a good look at their faces. Mitts identified [Petitioner] as one of the two men at his home that night. Mitts's dogs were barking in the backyard. Mitts heard the men call his dogs by their names. Since the men were now out of the camera's view, Mitts could no longer see them but he heard the sounds of prying on the sliding glass door. Mitts called 911 to notify the police. While one of the men was prying on the sliding door, Mitts could hear the other pulling at the security bars on the bedroom windows.

Mitts remained on the phone with the police dispatcher, who told him when the officers arrived at the duplex. Just prior to when the police arrived, Mitts heard the sliding door pop open. Mitts let the two officers in the front door and directed them to the open sliding glass door. The officers went out the sliding glass door. Mitts stuck his head out the door to call his dogs inside. He saw a person on the ground to his right. The officers shouted at the man to freeze and drop his knife. The man started to get up, reached down and removed a gun from his waistband. Mitts jumped back inside and heard shots fired.

Officer Howard Stevenson was on duty with Officer Trenton Johnson on the evening of February 26. Just before 11:00 p.m., they were dispatched to Mitts's duplex to respond to a burglary in progress. Officer Stevenson approached the duplex and heard the sound of prying of metal coming from the side yard. Mitts opened the front door and Officer Stevenson drew his weapon. The officers went to the sliding glass door and Officer Stevenson entered the side yard. He saw Duckett lying on the ground. Duckett started to get up. As he did, Officer Stevenson told him to get down. Duckett did not comply. He put his hand underneath his coat and pulled out a handgun. Officer Stevenson fired three shots at Duckett. Officer Stevenson did not see another suspect in the yard.

Duckett died from the gunshot wounds. Detective Bryon Elness, who was assigned to the crime investigation, arrived at the scene. A "Leatherman" multipurpose tool with its knife blade open was found in Duckett's left hand. Six inches from the same hand was a loaded, .45-caliber handgun. According to Detective Elness, a Leatherman tool can be used to gain entry into a metal door or window frame. Damage to the window track and sliding door frame were noted.

Officer Greg Yotsuya was on duty on the evening of February 26 and after 11:00 p.m. heard the radio call regarding a burglary at Mitts's address. A minute or two after posting himself at this address, Officer Yotsuya heard shots fired. Less than a minute later, Officer Yotsuya heard noises from the fenced area and saw a man come over the fence. Officer Yotsuya ordered the man to stop. The man continued running and Officer Yotsuya chased him. The man finally stopped and Officer Yotsuya forced him to the ground when he did not comply with his order to get down. Officer Toysuya identified the man as [Petitioner].

[Petitioner] was searched by Officer Yotsuya and another officer who arrived to assist him. A loaded, nine-millimeter semiautomatic handgun, a loaded, .22-caliber handgun, and several knives were found on [Petitioner's] person. [Petitioner's] car was found parked on the street around the corner from Mitts's duplex.

DEFENSE

Ryken testified that she had been Mitts's girlfriend for a couple of months and had become pregnant. Ryken stated Mitts did not care about the pregnancy.

4

When Ryken returned to Mitts's duplex after being gone for several days, he became angry and beat her although she had done nothing wrong. Ryken testified that at some point she went to the hospital and had a miscarriage.

A couple of days after the fight with Mitts, Ryken went to the hospital, but was not seen by a doctor. She left the hospital because she had to wait too long. Ryken called [Petitioner], who gave her a ride home. Ryken told [Petitioner] what had happened with Mitts, and [Petitioner] became upset.

Ryken testified that she did not take drugs between Valentine's Day and her return to Mitts's duplex on February 17. She did acknowledge, however, that she sometimes used drugs. Ryken testified she wanted to get her belongings out of Mitts's duplex and she told him she would leave when she did so.

Ryken believed Mitts had a lot of money. Ryken told various people Mitts had a log of money.

[Petitioner] testified he received a call from Ryken at approximately 3:30 a.m. one morning. Ryken told [Petitioner] Mitts had beaten her and she was in the hospital having a miscarriage. Ryken told [Petitioner] she had been at the hospital for hours and needed a ride home.

[Petitioner] testified he met Mitts once prior to the incident on February 26. [Petitioner] stated he went to see Mitts on February 26 because he promised Ryken he would talk to Mitts about "the thing" with her. [Petitioner] stated he wanted to assure himself Mitts would not hurt Ryken again.

On February 26, [Petitioner] tried contacting Mitts about 6:00 p.m., but there was no answer when he knocked on the door. [Petitioner] claimed he parked across the street from Mitts's duplex for about five minutes but then left. When [Petitioner] later returned to Mitts's duplex, Duckett accompanied him. The two were on their way out of town when [Petitioner] decided to stop at Mitts's duplex.

[Petitioner] testified he never intended to harm Mitts or burglarize his home. [Petitioner] claimed he did not have any guns on his person when he and Duckett went to Mitts's duplex. He did have knives on his person, because he dealt in knives as a business and always carried them as an advertisement. [Petitioner] did not know if Duckett was carrying a gun, but did know he also had knives on him. [Petitioner] testified he parked his car around the corner in front of a friend's house because there was no parking on the street in front of the duplex.

When [Petitioner] and Duckett reached Mitts's front door, [Petitioner] knocked and rang the doorbell. Mitts answered, and [Petitioner] and Duckett entered. [Petitioner] told Mitts he wanted to talk to him about Ryken. Mitts asked them to wait outside because he had a girlfriend in the house. Mitts was wearing shorts and a "slingshot" undershirt, and told [Petitioner] he wanted to put on some warmer clothes and then they could talk outside. [Petitioner] denied attempting to pull the bars off the window or attempting to break into Mitts's house.

[Petitioner] testified that he then heard the side door open and a "scrambling" sound, as if someone fell. He heard someone yell, "He's got a gun," followed by gunshots. [Petitioner] thought Mitts shot Duckett, so he ran. He also thought someone was shooting at him because he heard another shot after the initial burst of gunfire. When the officer told him to stop, [Petitioner] stopped running. [Petitioner] testified he was not in possession of either of the handguns Officer Yotsuya claimed to have removed from him.

On cross-examination, [Petitioner] acknowledged that he knew Yvetta Watson, the woman Mitts was to go out with on the evening of February 26. [Petitioner] also acknowledged having Watson's phone number in his wallet when he was arrested. According to [Petitioner], he was going to leave his pet wolf with Watson while he was out of town, but later changed his mind. [Petitioner] testified Duckett knew Watson, "A lot better than I did."

[Petitioner] explained that although he had parked in front of Mitts's duplex earlier in the evening, he did not approach the apartment. Instead, he

5

waited in the car, hoping Mitts would see him and come talk to him. [Petitioner] testified he only waited at most five minutes and then left.

[Petitioner] testified that when he and Duckett returned to Mitt's duplex later in the evening, there were no cars parked in front of the house. Mitts invited the two men in to talk, and then asked them to step outside because he did not want a woman in the house to hear the discussion about Ryken. Mitts took the men out the sliding door to wait for him.

[Petitioner] testified he then heard the sliding door open and a scuffling sound. He heard Duckett yell, "Who the fuck are you?" Duckett had fallen to the ground, but before he was able to get up, he was shot. [Petitioner] heard four or five shots. [Petitioner] also testified that a single shot was fired two seconds after the initial blast of shots. [Petitioner] jumped over the neighbor's fence and ran, thinking Mitts had shot Duckett. [Petitioner] testified that Officer Yotsuya's version of the events were untrue.

[Petitioner] acknowledged that while he had no plans to fight Mitts, he was prepared to fight if Mitts initiated. [Petitioner] acknowledged that the 911 tape did not reveal the sound of a later, separate gunshot he had described, but stated he thought the tape recording had not been played in its entirety to the jury.

[Petitioner] acknowledged he had two prior convictions of crimes involving theft.

REBUTTAL

Leroy Rice, who lived in the next duplex unit to Mitts, stated that on the evening of February 26 he had some friends at his home. Rice heard Mitts's dogs barking, so he turned off his interior light and looked out the window to see what was happening. Rice saw two men in Mitts's backyard. Rice saw one of the men prying at the window which had an air conditioner. Rice testified the other man was standing in the yard and addressing the dogs by name, telling them to be quiet. Rice ran to the front of the building to report what he had seen and heard three loud bangs in rapid succession.

Kara Harvey testified she was in Rice's home on February 26. That evening, she saw two people in Mitts's yard. One of the men was at the back window, the other was moving around the yard. Harvey heard the men telling the dogs to be quiet. She also heard a voice say, "stop, police, freeze," followed by two or three gunshots.

Edward LeDonne, a gun dealer, testified he sold the two guns found on [Petitioner] and the .45-caliber gun found next to Duckett. The .45-caliber gun and the .22-caliber gun [Petitioner] had were sold to Watson, the woman who canceled the date with Mitts. LeDonne recognized [Petitioner] from when [Petitioner] had been in the shop.

SURREBUTTAL

Alfred Neep, who worked for the Ceres Police Department in February 1998, interviewed Rice and Harvey after the incident at Mitts's home. At that interview, Rice did not tell Neep about anyone trying to pry bars off a window, and Harvey did not say she heard someone telling the dogs to be quiet.

(Respondent's Exhibit 5, Opinion, at 2-9.)

///

///

6

1              DISCUSSION

2   A.    Jurisdiction

3          Relief by way of a petition for writ of habeas corpus extends to a person in custody

4   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8   out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

9   Court.  28 U.S.C. § 2254(a); 2241(d).

10          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), cert. denied, 522 U.S.

13  1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

14  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

15  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18  B.    Standard of Review

19          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20  custody pursuant to the judgment of a State court only on the ground that he is in custody in

21  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22          The AEDPA altered the standard of review that a federal habeas court must apply with

23  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

24  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

25  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

26  to, or involved an unreasonable application of, clearly established Federal law, as determined by

27  the Supreme Court of the United States;" or "resulted in a decision that was based on an

28  unreasonable determination of the facts in light of the evidence presented in the State Court

7

1    proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>,123 S.Ct.1166 (2003) (disapproving of

2    the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v.</u>

3    <u>Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

4    because that court concludes in its independent judgment that the relevant state-court decision

5    applied clearly established federal law erroneously or incorrectly."  <u>Lockyer</u>, at 1175 (citations

6    omitted).  "Rather, that application must be objectively unreasonable."  <u>Id</u>. (citations omitted).

7        While habeas corpus relief is an important instrument to assure that individuals are

8    constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

9    (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

10   criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

11   <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

12   factual determinations must be presumed correct, and the federal court must accept all factual

13   findings made by the state court unless the petitioner can rebut "the presumption of correctness

14   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115

15   S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>,

16   110 F.3d 1380, 1388 (9th Cir. 1997).

17   C.    <u>California Three Strikes Law - Ex Post Facto Violation</u>

18        Petitioner contends that the trial court's application of California's Three Strikes law in

19   determining his sentence constituted an ex post facto violation.  Petitioner contends that use of

20   the prior convictions resulting from his pre-1994 guilty pleas violation his rights under the Fifth,

21   Sixth and Fourteenth Amendments to the United States Constitution.

22        The ex post facto clause prohibits a state from enacting a law that imposes additional

23   punishment for a crime than the punishment was when the defendant committed the crime.

24   <u>Weaver v. Graham</u>, 450 U.S. 24, 28, 101 S.Ct. 960, 964 (1981).  A law violates the ex post facto

25   clause under three circumstances:  (1) when it punishes a act which was not a crime when it was

26   committed; (2)  when it makes a crime's punishment greater than when the crime was committed;

27   or (3) when it deprives a person of a defense available at the time the crime was committed.

28   <u>Collins v. Youngblood</u>, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719 (1990).  A statute enhancing a

1   defendant's sentence because the defendant is a recidivist does not punish the defendant again for

2   the prior offense.  Wittie v. United States, 515 U.S. 389, 400, 115 S.Ct. 2199, 2206 (1995).

3   Recidivist statutes have been upheld in the face of ex post facto arguments even if the

4   convictions used to enhance the sentence occurred before the recidivist statute was enacted.  See,

5   United States v. Ahumada-Avalos, 875 F.2d 681, 683-84 (9th Cir. 1989) (per curiam)

6        Here, the strikes alleged against Petitioner were as follows: (1) A August 3, 1973,

7   conviction for involuntary manslaughter and armed robbery; (2) A June 4, 1979, conviction for

8   kidnaping and assault with personal use of a firearm; (3) A January 22, 1987, conviction for

9   armed home invasion robbery; and (4) a June 25, 1990, conviction for burglary of an inhabited

10  dwelling.  (CT 149-150.)  Although each prior occurred prior to 1994, the use of these

11  convictions under Three Strikes law does not violate the ex post facto clause.  The Ninth Circuit

12  has held that the use of a pre-1994 strike to enhance a sentence does not violate the ex post facto

13  clause as long as the triggering offense was committed after March 1994, when Three Strikes

14  was enacted. United States v. Sorenson, 914 F.2d 173, 174 (9th Cir.1990); United States v.

15  Ahumada-Avalos, 875 F.2d 681, 683-84 (9th Cir.1984) (per curiam).  Petitioner committed the

16  triggering offense in February 1998, after Three Strikes was enacted, and therefore the use of the

17  pre-1994 priors to enhance his sentence did not violate the ex post facto clause.  Accordingly,

18  Petitioner's claim must fail.

19  D.    Ineffective Assistance of Counsel

20       Petitioner contends that trial counsel was ineffective for failing to move for a mistrial

21  when he learned one of the jurors suffered from attention deficit disorder.  Petitioner also claims

22  that appellate counsel was ineffective for failing to raise this claim in his direct appeal.

23       In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court

24  must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064

25  (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that

26  counsel's performance was deficient, requiring a showing that counsel made errors so serious that

27  he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland,

28  466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective

1 standard of reasonableness, and must identify counsel's alleged acts or omissions that were not

2 the result of reasonable professional judgment considering the circumstances. Id. at 688; United

3 States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's

4 performance is highly deferential. A court indulges a strong presumption that counsel's conduct

5 falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687,

6 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

7     Second, the petitioner must show that counsel's errors were so egregious as to deprive

8 defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must

9 also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

10 ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

11 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance

12 was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

13 (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

14 have been different.

15     A court need not determine whether counsel's performance was deficient before

16 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

17 Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove

18 prejudice, any deficiency that does not result in prejudice must necessarily fail.

19     Ineffective assistance of counsel claims are analyzed under the "unreasonable application"

20 prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062

21 (2000).

22     As Respondent indicates, under California law the permissible grounds for a new trial are

23 governed by statute.[4] Prior to the introduction of evidence in this case and at the close of the first

24 _____

25     [4] Section 1181 of the California Penal Code states:
    When a verdict has been rendered or a finding made against the defendant, the court may, upon his

26 application, grant a new trial, in the following cases only:
    1. When the trial has been had in his absence in cases where the trial may lawfully proceed in his absence;

27     2. When the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property;

28     3. When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented;

1  day of trial, Juror #9, indicated to the trial court that he had Attention Deficit Disorder.  (RT 28.)

2  The following exchange took place:

3          JUROR 9: Well, there is one other thing but I was a little embarrassed to
   bring it up.  I'm also ADD.
4          THE COURT: Okay.  Well, have you been able to understand everything
   that's been going on here so far?
5          JUROR 9: Well, no.
           THE COURT: No.  What didn't you - - what did you not understand?
6          JUROR 9: I have a very short attention span, basically.  It's a chemical
   imbalance in my head.
7          THE COURT: All right.  What do you do for a living?
           JUROR 9: I work at Round Table.  Well, actually, I just started, so I
8  haven't even started the job yet.
           THE COURT: And how old are you?
9          JUROR 9: Eighteen.
           THE COURT: Okay.  And you work there full-time?
10         JUROR 9: No.
           THE COURT: Are you a student, also?
11         JUROR 9: Yeah.  I'm going to be.  I just barely graduated.
           THE COURT: Where are you going to be a student?
12         JUROR 9: MJC.
           THE COURT: Okay.  You just graduated from high school?
13         JUROR 9: Uh-huh (yes).
           THE COURT: All right.  Well, all right.  But, apparently, you can get
14 around the transportation issue; right?
           JUROR 9: I - - I'm not really sure.

15

16 _____

17     4. When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the
   part of all the jurors;
       5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of
18 law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has
   been guilty of prejudicial misconduct during the trial thereof before a jury;
19     6. When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be
   not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser
20 crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or
   ordering a new trial, and this power shall extend to any court to which the cause may be appealed;
21     7. When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by
   statute in the trial court or jury to recommend or determine as part of its verdict or finding the punishment to be
22 imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or
   ordering a new trial, and this power shall extend to any court to which the case may be appealed;
23     8. When new evidence is discovered material to the defendant, and which he could not, with reasonable
   diligence, have discovered and produced at the trial.  When a motion for a new trial is made upon the ground of
24 newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the
   witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such
25 affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the
   case, may seem reasonable.
26     9. When the right to a phonographic report has not been waived, and when it is not possible to have a
   phonographic report of the trial transcribed by a stenographic reporter as provided by law or by rule because of the
27 death or disability of a reporter who participated as a stenographic reporter at the trial or because of the loss or
   destruction, in whole or in substantial part, of the notes of such reporter, the trial court or a judge, thereof, or the
28 reviewing court shall have power to set aside and vacate the judgment, order or decree from which an appeal has
   been taken or is to be taken and to order a new trial of the action or proceeding.

1    THE COURT: Well, you're going to have to do your best on that.
     But, counsel, if you'll approach the side-bar, please.

2    (Whereupon a discussion was had between Court and Counsel outside the hearing of the reporter and juror.)

3    THE COURT: Well, all right. . . . [¶] I can understand the feelings that you have personally about any ADD situation and I don't want to invade your privacy

4    necessarily, I understand that, but let me ask you this: If you're at liberty to tell me, if you want to, and if you don't, I respect that, have you been professionally

5    diagnosed by anybody with ADD?  By ADD you mean attention deficit disorder, is that what you're saying?

6    JUROR 9: Yeah.
     THE COURT: And were you professionally diagnosed by anybody?

7    JUROR 9: No, I can't say that I was.
     THE COURT: So you haven't had a psychologist or psychiatrist or school

8    counselor render that kind of evaluation then?

9    JUROR 9: I - - well, yes and no, I guess you could say.  I was taken out of school when I was in the sixth grade for three years on independent study by recommendation of the school counselor because I didn't pay attention - -

10   THE COURT: All right.
     JUROR 9: - - a lot and then I came back in high school.

11   THE COURT: All right.  Well, let me ask you this: Have you understood basically what's been going on here this morning?  You understand you've been

12   asked to be a juror in this case.  You know what a juror is; right?
     JUROR 9: Yeah.

13   THE COURT: Okay.  You know what a jury trial is.
     JUROR 9: Uh-huh (yes).

14   THE COURT: Can you tell me, what are the charges in this case?  Can you tell me what the charges are?  What is the defendant accused of doing?  What

15   are the allegations?
     JUROR 9: Um - -

16   THE COURT: Do you know how many counts there are?
     JUROR 9: Two.

17   THE COURT: I'm sorry?
     JUROR 9: I - -

18   THE COURT: You don't know.  Do you know what the charges are against the defendant?

19   JUROR 9: Burglary.
     THE COURT: Okay.  Do you know what else he's charged with?

20   JUROR 9: Assault.
     THE COURT: Okay.  Do you know what your function would be as a

21   juror?  What would you have to do in this case?  Would you have to listen to the evidence?

22   JUROR 9: Yeah.
     THE COURT: Okay.  After you listen to the evidence and the Court

23   instructed you on the law, then you that you have to go in the jury deliberation room. Would you be able to talk about the case with the other jurors?

24   JUROR 9: Yeah.
     THE COURT: Okay.  And do you feel that during the course of the trial,

25   you'd be able to listen to the evidence in the case?  Do you feel you could do that?
     JUROR 9: Well, that's the case, because I have such a short attention span

26   that I tend to - - kind of my mind wanders off.  I'm sort of a dreamer, I guess you could say.

27   THE COURT: Okay.  Well, if you took notes and you had a notebook and a pencil during the course of the trial, do you think that might help you to

28   concentrate on the testimony, by taking notes?

12

1                JUROR 9: It might.

               THE COURT: Okay.  Well, what do you think?  You think you can give it
2 a fair try?

.........................................................................................................................
               THE COURT: [¶] Frankly, listening to you, you sound articulate to me,
you sound intelligent to me, and it seems to me that if you do, that's your
decision, if you do want to take notes.  That may be something you may want to
do to assist you in paying attention to the proceedings.  I'll be watching and
making certain that you're fulfilling your responsibilities, but as I said, you seem
articulate and intelligent to me and I have no doubt that, at this point, that you
would not be able to perform your duties as a juror.  I think you could.
.........................................................................................................................
               THE COURT: [¶] Counsel, my first impression with regard to [Juror 9]
was that I was concerned about the statement he made that he might have ADD.
Obviously, the defendant and the People are both entitled to have jurors who are
paying attention to the proceedings here and are aware of what's going on in
court.  I did forget to remind him of the charges before he left.

(RT 28-35.)

     At the end of the third day of trial, defense counsel noted that Petitioner was

observing Juror 9 and he may not have been fully concentrating on the case.  (RT 328.)  In

response, the trial court stated:

               THE COURT: Yes, I was observing him today.  I do note he doesn't
always look in the direction of the testimony being given.  I can't tell at this point
whether or not he's taking notes.  I have to say that I have been observing him.
Whether or not I can tell you what's going on in his mind, the answer is, no, I
can't.  If I can do that some day, I'll go into another profession.
               [DEFENSE COUNSEL]: That's fine.
               THE COURT: But I have to say I am making an effort to observe him.
The [sic] anybody has any different observations or comments to make.

.........................................................................................................................
               THE COURT: Well, it's a concern to the Court, too, in light of what the
witness told the Court that - - again, I've been watching the juror, not constantly
but periodically, as I deem it necessary and appropriate, and I have to say that I
find no evidence before the Court at this time, through my own personal
observation, that the juror is not paying attention to the proceedings.

(RT 328-329.)

     Obviously, defense counsel did not merely forget to challenge the juror, but decided not

to do so.  The choice was tactical; the question is whether, on this record, the decision not to

challenge the juror was an incompetent tactical choice.  As the trial transcript clearly reveals, the

trial court took great caution in ascertaining whether Juror 9 would be able to fulfill his

responsibilities and duties as a juror in Petitioner's case.  Although the juror indicated that he

1 believed he had Attention Deficit Disorder, he assured the trial judge that he was aware of the

2 charges,[5] was aware of his duties in listening to the evidence, and would be fully capable of

3 discussing the evidence with fellow jurors. (RT 28-35.)  Thus, there is no basis in the record to

4 support the filing of a motion for a new trial and counsel was not incompetent for failing to file

5 such a motion.

6       In any event, even had defense counsel made a motion for a new trial, given the trial

7 judge's assessment and assurance that Juror 9 was fully capable of, and did in fact perform his

8 duties as a juror, it is not reasonably likely that the trial court would have granted a defense

9 motion for a new trial, as the trial court found no improper conduct or basis for excusing the

10 juror. (RT 28-35, 328-329.)  There is simply no evidence to support Petitioner's claim that Juror

11 9 did not fulfill his duties as an impartial juror in this case.  Thus, there is not a reasonable

12 probability that, but for counsel's unprofessional errors, the result would have been different**.**  As

13 such, Petitioner's claim fails.

14       Petitioner's claim that Juror 9 was sleeping during trial is unsupported by the record.

15 Although the trial court noted that Juror 9 did not always look in the direction of the proposed

16 testimony, there is no evidence, and Petitioner points to none, to demonstrate that Juror 9 was

17 sleeping during trial.  Further, Petitioner has failed to demonstrate any resulting prejudice.

18 Petitioner's conclusory allegation that Juror 9 could not make an informed decision and that this

19 juror may have been the one juror to deadlock the jury, fails to demonstrate prejudice.

20 Petitioner's allegations amount to nothing more than mere speculation.  See Cooks v. Spaulding,

21 660 F.2d 738, 740 (9th Cir. 1981) (per curiam) (mere speculation insufficient to demonstrate

22 prejudice.)

23       With regard to Petitioner's claim that appellate counsel was ineffective for failing to raise

24 this claim on appeal, it too is without merit.  Effective assistance of appellate counsel is

25 guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey , 469 U.S.

26

27    [5] Petitioner stresses the fact that Juror 9 indicated that one of the charges Petitioner was facing was for assault, which was incorrect.  This is insignificant; the juror clearly understood that Petitioner was on trial for

28 burglary, that the other charge was possession of a firearm and not assault is insignificant and does not provide a basis for defense counsel to excuse this juror or make a motion for a new trial.

387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed

according to <u>Strickland 's</u> two-pronged test.  <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th

Cir.1989)<i>;</i> <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>See</u>, <u>also</u>, <u>Penson v. Ohio</u>,

488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or

constructively denied the assistance of appellate counsel altogether, the <u>Strickland</u> standard does

not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel

is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that appellate

counsel's deficient performance fell below an objective standard of reasonableness under

prevailing professional norms.   <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 104 S.Ct. 2052,

2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a

reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on

appeal. <u>Id</u>. at 694. A "reasonable probability" is a probability sufficient to undermine confidence

in the outcome. <u>Id</u>. The relevant inquiry is not what counsel could have done; rather, it is whether

the choices made by counsel were reasonable. <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th

Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he

has wider discretion than trial counsel in weeding out weaker issues; doing so is widely

recognized as one of the hallmarks of effective appellate assistance. <u>Miller v. Keeney</u>, 882 F.2d

1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner

because it would draw an appellate judge's attention away from stronger issues and reduce

appellate counsel's credibility before the appellate court. <u>Id</u>.  Appellate counsel has no

constitutional duty to raise every nonfrivolous issue requested by petitioner. <u>Id</u> at 1434 n.10

(<i>citing</i> <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

For the reasons explained above, because defense counsel was not ineffective nor was

Petitioner prejudiced by counsel's failure to file a motion for a new trial, it necessarily follows

that appellate counsel was not ineffective for failing to raise this claim on appeal.  <u>See</u> <u>Morrison</u>

<u>v. Estelle</u>, 981 F.2d 425, 427-428 (9th Cir. 1992) (holding that counsel's failure to raise an issue

on appeal does not constitute ineffective assistance of counsel if counsel had no reasonable

likelihood of success in arguing the issue); see also Miller v. Keeney, 882 F.2d at 1434 n.10;

Jones v. Barnes, 463 U.S. at 751-754.

E.   Cruel and Unusual Punishment

Petitioner contends that his sentence of fifty-five years to life constitutes cruel and

unusual punishment in violation of the Eighth Amendment.

1.   Procedural Default

Respondent contends that this claim is procedurally defaulted based on the California

Supreme Court's citation to In re Clark, 5 Cal.4th 770 (1993) (invoking California's rule barring

untimely petitions.)  As Respondent indicates, Petitioner first raised this claim in a petition for

writ of habeas corpus filed in the Stanislaus County Superior Court on February 15, 2002.

(Respondent's Exh. 9.)  In that petition, Petitioner argued that based on the facts of his case, a

sentence of fifty-five years to life violated the Eighth Amendment prohibition against cruel and

unusual punishment.  (Respondent's Exh. 9 at 9.)  The Stanislaus Superior Court denied the

petition, finding that Petitioner's crimes resulted in the death of a co-participant, stating the

"[s]entence is not cruel and unusual for an attempted burglary with a firearm resulting in a

death[,] with multiple priors."  (Respondent's Exh. 9 at 1.)  Petitioner then raised the same claim

in a subsequent petition for writ of habeas corpus filed in the California Supreme Court on July

15, 2002.  The state's highest court denied the petition on November 20, 2002, citing In re Clark,

5 Cal.4th 750.

As Respondent submits, Petitioner filed his first petition for writ of habeas corpus in the

California Supreme Court on August 24, 2001.  However, Petitioner did not present the instant

claim to the high court until he filed a second petition on July 15, 2002.

A federal court will not review claims in a petition for writ of habeas corpus if the state

court has denied relief on those claims by a state law that is independent of federal law and

adequate to support the judgment.  A federal court will not review a petitioner's claims if the

state court has denied relief of those claims pursuant to a state law that is independent of federal

law and adequate to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct.

2590, 2592 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2553-54

1   (1989); See, also, Fox Film Corp. v. Muller, 296 U.S. 207, 210, 56 S.Ct. 183, 184 (1935).  A

2   state court's refusal to hear the merits of a claim because of petitioner's failure to follow a state

3   procedural rule is considered a denial of relief on independent and adequate state grounds.  Harris

4   v. Reed, 489 U.S. 255, 260-61, 109 S.Ct. 1038, 1042 (1989).  This doctrine of procedural default

5   is based on the concerns of comity and federalism. Coleman, 501 U.S. at 730-32, 111 S.Ct. at

6   2554-55.

7               a.      Independent State Ground

8            "For a state procedural rule to be 'independent,' the state law basis for the decision must

9   not be interwoven with federal law." LaCrosse, 244 F.3d at 704 (citing Michigan v. Long, 463

10  U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir.

11  1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily

12  on federal law, or to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at 735, 111

13  S.Ct. 2456)).   "A state law is so interwoven if 'the state has made application of the procedural

14  bar depend on an antecedent ruling on federal law [such as] the determination of whether federal

15  constitutional error has been committed.'" Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma,

16  470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

17           In Bennett v. Mueller, 322 F.3d 573, the Ninth Circuit reiterated that California's

18  untimeliness rule cannot be applied to bar federal review to Petitioner's who initiated their state

19  habeas proceedings before the issuance of In re Clark, 5 Cal.4th 750, 21 Cal.Rptr.2d 509 (1993)

20  and In re Robbins, 18 Cal.4th 770, 77 Cal.Rptr.2d 153 (1998).  Bennett v. Mueller, 322 F.3d 573,

21  580 (9th Cir. 2003).  The Court also held that the California Supreme Court's post-Robbins

22  denial for lack of diligence (untimeliness) was not interwoven with federal law such that it is an

23  "independent procedural ground." Bennett, 322 F.3d at 582-83.

24           Here, the California Supreme Court denied Petitioner's second petition for writ of habeas

25  corpus on November 20, 2002, over four years after Robbins was decided.  Thus, the

26  "independent" prong of the procedural-default analysis is satisfied because the California

27  Supreme Court's application of Clark is a post-Robbins application of California's untimeliness

28  rule.

1              b.    Adequate State Ground

2        To be deemed adequate, the state law ground for decision must be well-established and

3   consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural

4   rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly

5   followed' at the time it was applied by the state court.")(quoting Ford v. Georgia, 498 U.S. 411,

6   424, 111 S.Ct. 850 (1991)).  Although a state court's exercise of judicial discretion will not

7   necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment

8   according to standards that, at least over time, can become known and understood within

9   reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).

10       Petitioner was aware of the grounds for this claim when he was sentenced on November

11  3, 1999 (CT 259-260), and the conviction became final sixty days after his sentence was

12  imposed.  Cal.R.Ct. 31(a); People v. Mendez, 81 Cal.Rptr.2d, 301, 19 Cal.4th 1084, 969 P.2d

13  146 (1999).  As previously stated, Petitioner did not present this claim until July 15, 2002, over

14  two and one-half years after judgment was imposed.  (Respondent's Exh. 12.)  Although

15  Petitioner filed a habeas petition in the California Supreme Court on August 24, 2001, that

16  petition did not contain the instant claim.  (Respondent's Exh. 4.)  A significant amount of time

17  elapsed between the date Petitioner was aware of the basis for the instant claim (November 3,

18  1999) and when he belatedly presented the claim (July 15, 2002).

19       Respondent provides cases that support his contention that, subsequent to Clark,

20  California courts have consistently applied Clark's untimeliness bar.  Respondent cites Bennett,

21  which recognized that in 1993 the California Supreme Court's Clark decision set a definite rule

22  for timeliness for prospective application.  Bennett, 322 F.3d at 583.  Respondent also cites to In

23  re Sanders, 21 Cal.4th 697, 703 (1999), a California Supreme Court case that identified the

24  timeliness requirements in capital and noncapital cases and insisted that the court enforces such

25  requirements.  See Sanders at 703 ("we enforce time limits on the filing of petitions for writs of

26  habeas corpus in noncapital cases . . . as well as in cases in which the death penalty has been

27  imposed").  At the time of Petitioner's 2000 default, California's timeliness rule was clear, well-

28  established, and consistently applied.

                                      18

1    The Court finds that Respondent has adequately pled the existence of a procedural bar

2    and the burden therefore shifts to Petitioner who must assert factual allegations that demonstrate

3    the inadequacy of the state procedure.  In his traverse, Petitioner merely reargues the merits of his

4    claim and does not address the procedural bar.  As such, Petitioner has not met his burden.  Nor

5    has Petitioner demonstrated cause for the default and actual prejudice or that a failure to consider

6    the merits will result in a fundamental miscarriage of justice.  Therefore, this claim is

7    procedurally defaulted.  In any event, for the reasons explained below, there is no merit to

8    Petitioner's claim.

9           2.    Merits of Claim

10   A criminal sentence that is not proportionate to the crime for which a defendant is

11   convicted may indeed violate the Eighth Amendment.  The Supreme Court recently decided two

12   cases which discuss the clearly established federal law applicable to California Three Strikes

13   cases.  See Ewing v.  California, 123 S. Ct.1179 (2003); Lockyer v.  Andrade, 123 S. Ct.1166

14   (2003).

15   In Andrade, the Supreme Court discussed the current state of Eighth Amendment

16   proportionality review and held that the only clearly established governing legal principle is that

17   a "gross disproportionality" review applies to criminal sentences for a term of years.  Id. at 1173.

18   Citing extensively to its past cases dealing with criminal sentencing and proportionality under the

19   Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent

20   path for courts to follow."  Id.

21   The Supreme Court held that "the only relevant clearly established law amenable to the

22   'contrary to' or 'unreasonable application of' frame work is the gross disproportionality

23   principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and

24   'extreme' case."  Id.   The Court analyzed Andrade's sentence under Rummel v. Estelle, 445

25   U.S. 263 (1980), Solem v. Helm, 463 U.S. 277 (1983) and Harmelin v. Michigan, 501 U.S. 957

26   (1991), and held that the state court "did not confron[t] a set of facts that are materially

27   indistinguishable from a decision of this Court and nevertheless arrive at a result different from

28   our precedent."  Id.  at 1173-1174.  Using section 2254(d)(1)'s "unreasonable application" clause,

1    the Court also held that it was not objectively unreasonable for the California Court of Appeal to

2    conclude that the contours of the gross disproportionality principle permitted an affirmance of

3    Andrade's Three Strikes sentence. Id. at 1175.

4         In Ewing, the Supreme Court again reviewed the constitutionality of a Three Strikes

5    sentence of 25 years to life for stealing three golf clubs. After reviewing the Court's Eighth

6    Amendment jurisprudence, the Court chose to adopt Justice Kennedy's view that:

7         [There are] four principles of proportionality review-- the primacy of the
         legislature; the variety of legitimate penological schemes; the nature of our federal
8         system; and, the requirement that proportionality be guided by objective factors–
         that inform the final one: The Eighth Amendment does not require strict
9         proportionality between the crime and the sentence. Rather, it forbids only
         extreme sentences that are 'grossly disproportionate' to the crime.

10

11   Ewing, at 1186-1187.

12        Recognizing that state legislatures have a right to formulate penological schemes

13   consistent with the state's policy goals and free from federal intrusion, the Court validated the

14   California Three Strikes law, stating "[s]electing the sentencing rationales is generally a policy

15   choice to be made by the state legislatures, not the federal courts." Id. at 1187. The Court

16   deferred to the California Legislature's policy judgement to enact a tough recidivism statute and

17   held that states have "a valid interest in deterring and segregating habitual criminals." Id. (citing

18   Parke v. Raley, 506 U.S. 20, 27 (1992)).

19        In conducting a proportionality review of Ewing's sentence, the Court stated, "[i]n

20   weighing the gravity of Ewing's offense, we must place on the scales not only his current felony,

21   but also his long history of felony recidivism." Id. at 1189-1190. The Court noted that "any

22   other approach would fail to accord proper deference to the policy judgments that find expression

23   in the legislature's choice of sanctions." Id. at 1190. In imposing a Three Strikes sentence on a

24   recidivist criminal, the Court recognized the state's interest in dealing "in a harsher manner with

25   those who by repeated criminal acts have shown that they are simply incapable of conforming to

26   the norms of society as established by its criminal law." Id. (citing Rummel v. Estelle, 445 U.S.

27   263, 276 (1980)). Accordingly, proportionality review must take this interest into account. Id.

28   The Court held that Ewing's sentence of 25 years to life was justified by the State's public-safety

1    interest in incapacitating and deterring recidivist felons, and amply supported by Ewing's long,

2    serious criminal record.  Id.

3         In reviewing Petitioner's claim, this Court will begin with a brief overview of the Eighth

4    Amendment jurisprudence and the proportionality standard.  In Rummel, the Court upheld a life

5    sentence imposed under a Texas recidivist statute for a defendant convicted of obtaining $120.75

6    by false pretenses, an offense normally punishable by imprisonment for two to ten years.

7    Rummel, 445 U.S. at 266, 100 S.Ct. at 1135.  However, because he had two prior felony

8    convictions (for fraudulent use of a credit card and passing a forged check), and had served two

9    prior prison terms, the prosecution chose to proceed under the state's recidivist statute, which

10   carried a life sentence.  Id.  The Supreme Court held that Rummel's sentence of life

11   imprisonment *with* the possibility of parole did not violate the Eighth Amendment.  Id. at

12   265-266 (emphasis added).  The Court noted that Rummel had suffered two separate convictions

13   and terms of imprisonment for each prior, that he would be eligible for parole in twelve years,

14   and that under the Texas recidivist statute, prosecutors retained the discretion not to invoke the

15   statute for "petty" offenders.  Id. at 278-81.

16        Three years later, the Supreme Court set forth the criteria for finding a sentence to be

17   cruel and unusual punishment under the federal Constitution and affirmed a decision of the

18   Eighth Circuit holding unconstitutional a sentence of life imprisonment without the possibility of

19   parole for a seven-time nonviolent felony recidivist.  Solem v. Helm, 463 U.S. 277, 103 S.Ct.

20   3001 (1983).  Defining a three-part proportionality criteria, the Court concluded that Solem's

21   sentence was grossly disproportionate to his crime of uttering a "no account" check for $100.00,

22   even in light of his prior six nonviolent felony convictions: three for third degree burglary, one

23   for obtaining money under false pretenses, one for grand larceny, and one for driving while

24   intoxicated.  Id. at 279-81.  The Court emphasized that Solem's life sentence was far more severe

25   than the sentence it had considered in Rummel, because Rummel was likely to be eligible for

26   parole in twelve years, while Solem was given no possibility of parole at all.  Id.

27        In Harmelin, the defendant received a mandatory sentence of life in prison *without* the

28   possibility of parole for possession of more than 650 grams of cocaine, his first felony offense.

21

1    501 U.S. 957 (1991)(emphasis added).  The Supreme Court upheld the sentence, with five

2    justices agreeing, for varying reasons, that the sentence did not violate the Eighth Amendment.

3    Although the Court did not produce a majority opinion, seven justices favored some manner of

4    proportionality review.  Justice Kennedy, joined by Justices O'Connor and Souter, stated that a

5    noncapital sentence could violate the Eighth Amendment if it was "grossly disproportionate" to

6    the crime, but concluded that courts need not examine the second and third factors of

7    intrajurisdictional and interjurisdictional reviews discussed in Solem, unless "a threshold

8    comparison of the crime committed and the sentence imposed leads to an inference of gross

9    disproportionality."  Id. at 1005.

10    The majority of the justices in the Harmelin Court agreed that outside capital punishment,

11    deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of

12    objective guidelines for terms of imprisonment.  501 U.S. at 964.  The threshold for such an

13    inference of disproportionality is high.  See id. at 1001 (Kennedy, J. concurring).  Generally, so

14    long as the sentence imposed by the state court does not exceed statutory maximums, the

15    sentence will not be considered cruel and unusual punishment under the Eighth Amendment.

16    United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

17    The Harmelin Court concluded that the defendant's sentence did not meet the threshold

18    factor of "gross disproportionality."  Justice Kennedy stressed the serious nature of Harmelin's

19    offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively

20    minor, nonviolent crime at issue in Solem."  Harmelin, 501 U.S. at 1002.  Justice Kennedy

21    further noted that the "possession, use, and distribution of illegal drugs represent 'one of the

22    greatest problems affecting the health and welfare of our population.'" and that the quantity of

23    cocaine possessed by Harmelin had a potential yield of between 32,500, and 65,000 doses.  Id.

24    To the extent Petitioner relies on the Ninth Circuit's ruling in Andrade v. Lockyer, 270

25    F.3d 743, this decision was overturned by the United States Supreme Court:

26         The gross disproportionality principle reserves a constitutional violation for only
          the extraordinary case.  In applying this principle for § 2254(d)(1) purposes, it was
27         not an unreasonable application of our clearly established law for the California
          Court of Appeal to affirm Andrade's sentence of two consecutive terms of 25
28         years to life in prison.

22

1    <u>Lockyer v. Andrade</u>, 538 U.S. 63, 77 (2003).  Comparing Petitioner to the defendants in

2    <u>Rummel</u>, <u>Solem</u>, <u>Harmelin</u>, <u>Ewing</u>, and <u>Andrade</u> reveals that the punishment was not cruel and

3    unusual.  In <u>Rummel</u>, the defendant's criminal history consisted of three non-violent theft or

4    forgery offenses which, in total, resulted in a loss to the victims of about $280.  <u>Rummel</u>, 445

5    U.S. at 266.

6          In <u>Solem</u>, the defendant had six prior felonies: three convictions for third-degree burglary,

7    one in 1964, another in 1966, and the third in 1969; a fourth conviction in 1972 for obtaining

8    money under false pretenses; a fifth conviction in 1973 for grand larceny; and a sixth conviction

9    in 1975 for third-offense driving while intoxicated.  His seventh felony for uttering a no account

10   check for $100, and resulted in a sentence of life without parole.  <u>Solem</u>, 466 U.S. at 279-281.

11         In <u>Harmelin</u>, the defendant was given a mandatory life without parole sentence for

12   possession of over 650 grams of cocaine, his first felony offense.  <u>Harmelin</u>, 501 U.S. at 961.

13   The Supreme Court upheld the life sentence.  <u>Id</u>. at 995-996.

14         In <u>Ewing</u>, the defendant suffered the following convictions: theft in 1984; felony grand

15   theft auto in 1988; petty theft with a prior in 1990; battery and theft in 1992; burglary in July

16   1993;  unlawful possession of a firearm and trespass in September 1993; burglary and robbery in

17   October and November 1993; and trespass and lying to a police officer in December 1993.

18   <u>Ewing</u>, 538 U.S. at 18-19.

19         In <u>Andrade</u>, the defendant suffered a misdemeanor theft offense in January 1982; a

20   burglary in November 1982; transportation of marijuana in 1988; theft offense and transportation

21   of marijuana in 1990; and escape from federal prison in 1991.  <u>Andrade</u>, 538 U.S. at 66-67.

22         Petitioner's criminal history is both serious and lengthy.  As previously stated, Petitioner

23   suffered a 1973 conviction for involuntary manslaughter and armed robbery, a 1979 conviction

24   for assault and kidnaping with personal use of a firearm, a 1987 conviction for armed home

25   invasion robbery, and a 1990 conviction for burglary of an inhabited dwelling.  (CT 149-150.)

26   The serious nature of Petitioner's triggering offense was demonstrated by the testimony that

27   showed he attempted to break into the victim's home, he was armed at the time, and his co-

28   conspirator was shot and killed by the police in the course of the attempted burglary.  (RT 111,

113, 138, 384, 391, 394, 397, 1078.)  Petitioner's past and current criminal history indicate that

he is preciously the type of offender for which the Three Strikes law was implemented.  As such,

the fifty-five year to life sentence is not cruel and unusual punishment under the Eighth

Amendment.

<u>RECOMMENDATION</u>

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The amended petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

These Findings and Recommendations are submitted to the assigned United States

District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-

304 of the Local Rules of Practice for the United States District Court, Eastern District of

California.  Within thirty (30) days after being served with a copy, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after

service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    October 27, 2005**                           _____ **/s/ Dennis L. Beck**_____
3b142a                                                    UNITED STATES MAGISTRATE JUDGE